IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT E. SETTLES,

          Plaintiff,                 No. CIV S-07-1820 EFB

     vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

          Defendant.          <u>ORDER</u>

_____/

      Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

("Commissioner") denying his applications for Disability Income Benefits ("DIB") and

Supplemental Security Income ("SSI"), under Titles II and XVI of the Social Security Act

("Act"), respectively. For the reasons discussed below, the court remands this matter for further

development of the record and reassessment of plaintiff's disability allegations.

I. <u>BACKGROUND</u>

      Plaintiff, born December 29, 1954, applied for DIB and SSI on November 19, 2002,

while still living in Tennessee, alleging disability since March 1, 2000, due to "mental problems,

depression, schizoprenia" [sic], noting that "the medication keeps me larthargic" [sic].

Administrative Record ("AR") 51-53, 56, 229-231. Plaintiff stated that he last worked as a truck

driver, from approximately 1970 to March 2000, but that he stopped working because he "see

1

thing that not there, hear voice; I could not function on the job," and because he "could not drive any more cause going sleep under the reel" [sic].  AR 56.

At the November 3, 2004 hearing before administrative law judge ("ALJ") Antonio Acevedo-Torres, plaintiff testified, with the assistance of counsel, that he was 49 years old and homeless.  AR 253.  He completed the eleventh grade, and worked as a certified truck operator and forklift driver most of his life.  AR 253-254.  Plaintiff testified that he last worked in June 2002, but stopped working when he "started having seizures, grand mal seizures."  AR 254.  He testified that :

> They put me in the crazy house three times before they finally diagnosed me. And once they diagnosed me with the seizures, they automatically took me off of driving because I was blacking out and stuff like that.  So they automatically suspended my license and . . . let it be known that I couldn't operate nothing, no kind of machinery or do nothing dealing with, you know, any kind of thing that's a danger to myself or others. . . . I was, you know, tripping out and they [were] violent type of seizures.  And everywhere I stayed, I was – ended up tearing up the peoples' houses, running through the houses, you know, scared, didn't know what was happening so I ended up at the mental health place three times not knowing what was going on with me until they finally diagnosed me and gave me all the tests and found out that I had seizures and started putting me on the proper medication which helped but it don't stop the seizures . . .

*Id.*  Asked how frequently he has seizures, plaintiff responded:

> Well, it's hard to pinpoint but it – I have them two or three times out of a week and mostly when I get stressed out or excited, you know, they come.  You know, they just – when they hit, if I'm out in the public, I'm breaking and running.  And if I'm in a room, I'm trying to get up out of there before I have to tear that room up. . .

*Id.*  When asked to clarify what he meant, he testified:

> Well, like if I was having a seizure right now and that door was locked, I'd tear the room up and with the behave that I'm having, it – you know, my whole body moves.  It's – if you ain't never seen it, you don't want to see it and when you see it, you're trying to get away from me.  And I'm trying to get – I ain't trying to really hurt nobody but I'm trying to protect me because it got me feeling like everybody trying to kill me and I'm just trying to get away.  And if I'm outside and it could be a thousand people in front of me, I'm going to run over them.  I'm trying to get away and I run so hard until I just pass out. . . . [S]cared me to death and all my family they couldn't – I couldn't live with none of them.

AR 264.

2

Plaintiff testified that he used to be a drug addict but hasn't used alcohol or drugs since 999. AR 255-256. He spent time in jail in the 1980s or 1990s because of his drug problem. AR 258. He also stated that in 1980 or 1981 he was shot in the head. AR 261. He elaborated:

> That what messed up my brain and it took fives [sic] years for the bullet to get in place before they would take it out. And, you know, once they took it out, I haven't been the same, you know what I mean? I'm – sometimes normal, sometimes abnormal . . .

AR 264. Asked how often he saw a doctor from 2000 to 2002, plaintiff testified:

> I didn't really start seeing a doctor until they finally checked me the 3rd of July 2002 and diagnosed me. They started sending me to a neurologist and they got to hooking me up with a specialist in the mental health place and all that, you know, came into place, but up until then I didn't really know. I thought I was going crazy. . . . I can't count the time. I mean, I had to go to so many specialists. I just can't remember. It was a bunch of them, you know. I mean, they had me going to MR – EGG whatever that was, going through all kind of machinery checking my brain for damage . . . . I was like going every other week.

AR 256. Asked how often he saw a doctor in 2003, plaintiff testified, "I'd say 50 times, you know. That's give or take." AR 257. Asked how often he'd seen a doctor during the current year, 2004, plaintiff testified that it was "halfway the same" until he came to Sacramento from Tennessee on June 14, 2004 (less than five months before the hearing). *Id.* Plaintiff explained:

> I don't have my own private doctor like I had in Tennessee . . . I have been going to mostly the mental health doctor and they been evaluating me and giving my medication and stuff like that. I don't have no neurologist and the specialists up here.

*Id.*

Plaintiff testified that he was taking seven different medications, including Risperdal (a psychotropic medication used to treat schizophrenia)[1] and Dilantin (antiseizure medication).[2]

---

[1] *See* Physicians' Desk Reference ("PDR"), 63rd ed. (2009), at p. 1753.

[2] "Dilantin is indicated for the control of generalized tonic-clonic (grand mal) and complex partial (psychomotor, temporal lobe) seizures and prevention and treatment of seizures occurring during or following neurosurgery." *See* http://www.rxlist.com/dilantin-drug.htm.

AR 257-258.  Plaintiff stated that he takes these medications for "bipolar, anxiety, schizophrenia, paranoia and depressed . . . [and] seizures."  AR 258.

> Asked how many hours he sleeps a night, plaintiff testified (AR 158):
> Until somebody wake me up or it rain or something, you know, moving about . . . all I do is sleep and eat and just, you know – I don't have the energy because I'm so drugged and all them antidepressants they will keep me down.

Plaintiff again referenced the side effects to his medication when asked about his ability to stand and walk:

> Well, like I say, I stay medicated.  Now, the medication I'm on, I prefer sleeping. I ain't prefer to walking.  You know what I mean?  They have me so down, you know, I just – I sleep most of the day.  And I don't be trying – the only time I walk [is] to go get something to eat, you know, use the bathroom and go back to bed.

AR 260.

Asked again about standing, plaintiff stated, "I prefer laying."  *Id.*  Asked how long he could sit, plaintiff mentioned that his back bothered him but testified:

> I could sit all day but I don't just try to count the hours.  I can sit down, you know, because I feel more comfortable sitting and laying because the medicine even better when I'm just comfortable, you know.  It's working me better, got me at a smooth state, you know, but just – it's really hard to explain. . .

AR 260-261.  Asked how much he can lift, plaintiff testified, "I ain't lift up nothing in two years so I couldn't tell you.  I'm going to be honest with you.  I don't know."  AR 261.

Concerning the side effects to his medications, plaintiff stated:

> The kind that keep you like real low, you know, keep you out of trouble, you know.  You be floating. . . . It take away my manhood.  That's the best I can sum it up, because I feel like nothing because I can't earn nothing.  I ain't doing nothing now.  I mean, I'm usually ready to go.  I just – I ain't worth a quart . . .Tired.  It takes away everything.  It takes away my energy . . . I can't function with this medication.

AR 262, 263.  Plaintiff testified that the medications "control him" by controlling "[s]o many different rages and it keep me from seeing things and the rages that's inside of me and, you know, the anger and, you know, the – it just controls me . . . ."  AR 263-264.

Plaintiff said that he was being treated by a mental health doctor at "The Guest House," where he goes once a week, or after five days if his medicine gets low, AR 262, and he received treatment in Tennessee at the "Family Health Center." AR 263.

The ALJ issued a decision on February 18, 2005, finding that plaintiff is not disabled.[3] AR 25-29. The ALJ initially noted that plaintiff had received disability benefits from March 1993 to January 1997, based on drug and alcohol abuse. AR 26. Plaintiff's benefits were terminated based on the change in eligibility precluding benefits to claimants whose alcoholism or drug addition is a "contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); "Contract with America Advancement Act (CAAA)," Pub. L. 104-121, § 105(b)(5)(A), 110 Stat. 847 (1996).

---

[3] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq.* Supplemental Security Income ("SSI") is paid to disabled persons with low income. 42 U.S.C. §§ 1382 *et seq.* Under both provisions, disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits. *See* 20 C.F.R. §§ 423(d)(1)(a), 416.920 & 416.971-76; *Bowen v. Yuckert,* 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater,* 81 F.3d 821, 828, n. 5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Bowen*, 482 U.S. at 146, n. 5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

The ALJ made the following formal findings:

1.  The claimant met the disability insured status requirements of the Act on March 1, 2000, the date the claimant stated he became unable to work, and continues to meet them through June 30, 2004.

2.  The claimant has not engaged in substantial gainful activity since March 1, 2000.

3.  The medical evidence establishes that the claimant has severe schizo-affective disorder, as well as substance induced mood disorder, reportedly in remission, and seizure disorder, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.  The claimant's subjective complaints are not credited because they are not reasonably supported by medical determinable impairments.

5.  The claimant has the residual functional capacity to perform the non-exertional requirements of work except for exposure to working at heights, around dangerous machinery or other environmental hazards.  There are no exertional limitations (20 CFR §§ 404.1545 and 416.945).

6.  The claimant is unable to perform his past relevant work.

7.  The claimant is 50 years old, which is defined as closely approaching advanced age (20 CFR §§ 404.1563 and 416.963).

8.  The claimant has a limited education (20 CFR §§ 404.1564 and 416.964).

9.  The claimant does not have any acquired work skills which are transferable to the skilled or semi-skilled work functions of other work (20 CFR §§ 404.1568 and 416.968).

10.  If the claimant's non-exertional limitations did not significantly compromise his ability to perform work at all exertional levels, section 204.00, Appendix 2, Subpart P, Regulations No. 4 indicates that a finding of not disabled would be appropriate.  If his capacity to work at all levels were significantly compromised, the remaining work which he would functionally be capable of performing would be considered in combination with his age, education, and work experience to determine whether a work adjustment could be made.

11.  Considering the range of work at all exertional levels which the claimant is still functionally capable of performing, in combination with age, education, and work experience, and using the above-cited section 204.00 as framework for decisionmaking, the claimant is not disabled.

12.  The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

AR 28-29.

On July 16, 2007, the Appeals Council denied plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. AR 6-8. The initial notice of denial was returned to the Commissioner, who sent it again on August 1, 2007, and provided an extension of time within which plaintiff was able to file this civil action. AR 5.

II. <u>ISSUES PRESENTED</u>

Plaintiff contends that the ALJ erred by failing to: (1) properly evaluate the medical evidence; (2) credit plaintiff's testimony and the statements of third parties; (3) assess plaintiff's residual functional capacity; and (4) obtain the testimony of a vocational expert. Each of these contentions has merit.

III. <u>LEGAL STANDARDS</u>

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

*Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

IV. MEDICAL EVIDENCE

    A. TREATMENT HISTORY

    1. Community Behavioral Health

       The earliest treatment note recounts plaintiff's involuntary psychiatric admission on November 11, 2002; he was discharged on November 15, 2002. AR 146-163. Plaintiff was hospitalized after threatening people with a hammer at a post office. AR 148, 149, 154, 155. Admitting medical personnel attributed plaintiff's behavior to a cocaine-induced psychosis. AR 148, 149. Plaintiff stated that he drank beer daily, AR 157, and had taken Valium, cocaine and beer a few days before, AR 153. Plaintiff stated that he began using alcohol and drugs around age 44. AR 151, 153. The admitting diagnosis, based on the American Psychiatric Association's multiaxial framework,[4] was:

    Axis I:    Mood disorder; bipolar disorder, secondary to cocaine use
                   Cocaine Dependence
    Axis II:  None
    Axis III:  None
    Axis IV:  No support.

---

[4] The American Psychiatric Association's Multiaxial Assessment is set forth in the Diagnostic and Statistical Manual of Psychiatric Disorders, ("DSM-IV") (4th ed. 1994), at pp. 25-33:

    Axis I:       Clinical Disorders
                   Other Conditions That May Be a Focus of Clinical Attention
    Axis II:      Personality Disorders
                   Mental Retardation
    Axis III:     Medical Conditions
    Axis IV:     Psychosocial and Environmental Problems
    Axis V:      Global Assessment of Functioning ("GAF")

The Global Assessment of Functioning ("GAF") Scale is a tool created by the American Psychiatric Association to assess "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DSM-IV, at p. 34. When two GAFs are provided, the first references current functioning or "on admission," while the second may reference "at discharge" or "highest level past year." *Id.* at p. 35.

Axis V:  GAF  30/70[5]

AR 155-156.  Plaintiff was discharged with prescriptions for Zyprexa (approved for treatment of schizophrenia and bipolar disorder),[6] and Depakote (approved for treatment of manic episodes associated with bipolar disorder).[7]  AR 146.

A subsequent one-page Discharge Planning sheet, noting hospitalization from July 6 to July 10, 2003, also notes prescriptions for Zoloft (approved for treatment of depression, panic disorder, and other disorders)[8] and Remeron (approved for treatment of major depressive disorder).[9]  AR 145.

2. Memphis Regional Medical Center

A one-page discharge summary from the Emergency Department, dated July 15, 2003, instructed plaintiff that, "You had a seizure.  You will need to take Dilantin for this problem until you see the neurologist in Neurology Clinic by calling [telephone number].  Return if worse."  A prescription for Dilantin was noted, and plaintiff was instructed not to drive until seen by a neurologist.  AR 144.

On September 4, 2003, plaintiff was again treated for seizure disorder.  AR 165.  The physician opined that plaintiff's seizures were "likely post trauma."  *Id.*  Plans were made to obtain MRI and EEG assessments.  *Id.*

---

[5]  A GAF 21-30 denotes "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stay in bed all day; no job, home, or friends).

A GAF 61 to 70 denotes "Some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV, at p. 34.

[6]  *See* http://www.zyprexa.com/index.jsp.

[7]  *See* http://www.rxlist.com/depakote-drug.htm.

[8]  *See* http://www.zoloft.com.

[9]  *See* http://www.rxlist.com/remeron-drug.htm.

3. <u>Health Loop, Shelby County Health Care Network and Comprehensive</u>
   <u>Counseling Network</u>

On January 10, 2004, plaintiff underwent a psychosocial diagnostic assessment.  AR 185-193.  He reported visual and auditory hallucinations, and manifested paranoid delusions.  He stated that he sleeps with a hammer and knife beside him or under his pillow.  AR 185, 186.  Plaintiff acknowledged that suicidal ideation, without a plan, and homicidal ideation "all the time," that he feels people are watching him.  AR 186.  Plaintiff stated that he has a history of cocaine addition, "7 or 8 years ago," and that he wasn't currently using alcohol or drugs.  AR 192.  The examiner found that plaintiff's symptoms significantly limited his activities of daily living.  AR 191.  The examiner reviewed a "crisis plan" with plaintiff and reminded him of the Mobile Crisis Unit in case of emergency.  AR 186.

On January 21, 2004, plaintiff was seen for bronchitis; additional assessments of seizure disorder and depression were noted.  AR 172.  He was described as a "V. hostile, angry man, swinging arms about stating inappropriate gibberish about health care.  Unsure what question is.  States over and over about getting out of the house with seizure activity yesterday.  Instructed to call 911 for grand mal seizure activity."  AR 173.

On February 16, 2004, plaintiff was psychiatrically evaluated by John Pharris, M.D.  AAR 178-184.  Plaintiff reported "visual and auditory hallucinations, and extreme paranoia: he sleeps with knife and hammer.  Sees things 'coming out of the walls.'" AR 179.  Dr. Pharris made the following diagnosis (AR 183-184):

Axis I:     Schizoaffective disorder
Axis II:    Paranoid personality traits
Axis III:   Seizure disorder; asthma
Axis IV:    Problems with primary support group and related to social
            environment; occupational and economic problems; problems with
            access to health care and related to legal system

////

////

10

Axis V:        GAF 40/40[10]

Dr. Pharris made goals to "alleviate/prevent psychosis and mood disturbance with psychotropic meds. Address psychosocial, needs counseling. Focus on neurological evaluation and management of seizure disorder. . . ." AR 184.

Treatment notes dated February 9, 2004, AR 170, and February 17, 2004, AR 169, are illegible.

On February 26, 2004, plaintiff was seen for "new and uncontrolled seizure activity" and referred to a neurologist. AR 166, 167.

An MRI of plaintiff's brain, conducted March 29, 2004, and requested due to "new onset of seizures," was normal. AR 164, 168.

4. El Hogar, Inc., Guest House Mental Health Clinic Sacramento County Mental Health and Community/Homeless Services

On July 14, 2004, plaintiff was evaluated pursuant to an Adult Comprehensive Assessment/Client Plan. AR 200-206. He stated that he was homeless and staying at the Salvation Army. AR 201. He said that he was experiencing depression, hopelessness, fear, anxiety, panic, confusion, poor memory, disturbing thoughts, auditory and visual hallucinations, paranoia, insomnia, and racing thoughts; and uncontrollable, compulsive and impulsive behavior. AR 200-201. He reported a suicide attempt in 2001, by cutting himself with a knife. AT 202. Plaintiff stated that he had prior substance and alcohol abuse, but had been clean for "a couple of years." AR 201. He reported that he had previously received mental health services and medication, and been psychiatrically hospitalized, in Memphis, Tennessee. AR 201, 202.

////

_____

[10] A GAF 40 (31 to 40) denotes "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV, at p. 34.

Plaintiff was initially diagnosed as "Schizophrenic Paranoid," AR 205, with a present Global

Assessment of Functioning ("GAF") of 50.[11]  AR 205.

On July 31, 2004, plaintiff was evaluated by Eric Schwartz, M.D.  Plaintiff reported that

he was born and raised in Tennessee, has six brothers and six sisters, and has seven children, but

has no current contact with his family.  AR 198.  Plaintiff stated that he started drinking alcohol

at an early age, "started using amphetamines at the age of 18, cocaine at the age of 35, heroin at

35, marijuana from 15 to 35."  *Id.*   He smokes a pack of cigarettes a day, and drinks coffee, but

denied any current substance abuse.  *Id.*  Plaintiff stated that he'd been in jail "about 15 times,

mostly for assaults," *Id.*  He said "he has had several suicide attempts, all overdoses on

medication."  *Id.*

Dr. Schwartz made the following diagnosis:

Axis I:    Schizoaffective disorder.
Axis II:   Deferred
Axis III:  1) seizure disorder 2) asthma 3) status post traumatic head injury
Axis IV:  Poor social network, homeless, and no income.
Axis V:   Current GAF:  45
             Highest GAF for past year:  45[12]

AR 199.

Dr. Schwartz prescribed Zyprexa, Depakote "for mood stabilization and also should help

with his seizure disorder," and Paxil "for depression."  AR 199.  An additional medication,

Klonopin (used for treating seizure or panic disorders),[13] was noted in subsequent treatment

notes.  AR 195, 196; 246-249.

////

---

[11]  A GAF 50 (41 to 50) denotes "Serious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or
school functioning (e.g., no friends, unable to keep a job).  DSM-IV, at p. 34.

[12]  *See* n. 11, *supra*.

[13]  *See* http://www.drugs.com/klonopin.html.

In November 2, 2004, Guesthouse Mental Health Assistant Carmen Pacheco wrote a letter "To Whom It May Concern," which provides in pertinent part that plaintiff "presently is attending all his appointments and is doing well on his medications. He has been coming in to meet with me and checking in on a weekly to biweekly basis." AR 194.

B. CONSULTATIVE EXAMINATIONS

1. Psychological Examiner Thomas F. Richardson, Jr., M.A.

On June 4, 1998, more than ten years ago, while plaintiff was incarcerated on charges of domestic violence, he was evaluated by psychological examiner Thomas F. Richardson, Jr., M.A., under the supervision of clinical psychologist Allen O. Battle, Ph.D. AR 116-119. The report recounts plaintiff's statements that he was suspended from school about 15 times before he quit in the 11th grade, had multiple juvenile arrests, married in 1982 and separated about six months later, and he is the father of seven children outside the marriage. AR 117. Plaintiff stated that he had "two adult arrests for possession of cocaine, one arrest for assault, and four arrests for domestic violence. This is his fourth adult incarceration. He has worked as a painter and carpenter and as a local delivery truck driver. He has also done construction work and his longest period of continuous, full-time employment was about one year. He last worked about a month ago and lost his job because of having been arrested." *Id.*

The report further provides :

> [Plaintiff] related that he began using marijuana during adolescence. He cited a history of using opioids, stimulants and cocaine. He related that he has participated in three rehabilitation programs, the last being in 1997. His longest sobriety has only been about two days. Prior to his current incarceration, he was smoking about ten "rocks' of crack cocaine per day and was also consuming about eight or nine quarts of beer per day.

*Id.*

Plaintiff exhibited "[n]o significant circumstantial thinking or loose associations. He denied hallucinations and unexplained mood shifts. Reality contact appeared adequate and he evidenced no overt signs of psychotic, delusional, or paranoid thinking. No unusual

psychomotor agitation or retardation was noted and his pace and persistence were adequate." AR 118.. Mr. Richardson concluded that plaintiff's performance accurately reflected his abilities when not using drugs or alcohol, and diagnosed plaintiff with polysubstance abuse. AR 118-119. The "composite clinical picture" provided:

> [I]t appears that Mr. Settles has the intellectual capacity to understand, remember, and carry out detailed instructions. He appears to suffer from polysubstance dependence which is likely to produce marked restriction in his social interactions and moderate restriction in his ability to sustain concentration and performance and demonstrate adequate persistence. [There] was no evidence of significant psychological restriction in the area of adaption. Mr. Settles should not experience significant psychological restriction to gainful employment if he is able to establish and maintain his sobriety.

AR 119.

### 2. Psychiatrist Reynaldo Abejuela, M.D.

On November 14, 2004, psychiatrist Reynaldo Abejuela, M.D., evaluated plaintiff at the request of the Commissioner. AR 207-217. Significantly, Dr. Abejuela noted, "There is no evidence of intoxication." AR 210, 212.

This report contains several significant inconsistencies and ambiguous findings. For example, Dr. Abejuela noted that plaintiff was living at the Salvation Army, AR 208, 212, and that he "lives in a house with his family," adding "[h]is relations with family/friends/neighbors and others are fair." TR 209. While noting plaintiff's complaint, "'sometimes I hear voices,'" AR 208, Dr. Abejuela found only "mild mood symptoms." AR 212. Despite noting plaintiff's subjective complaints of "depression and anxiety," Dr. Abejuela found that plaintiff has "no guilt feelings, no helplessness, worthlessness or hopelessness." AR 208. Under "Current Medications," Dr. Abejuela refers the reader to "History of Present Illness," AR 209; however, medications are not mentioned under that heading, AR 207-208; rather, Dr. Abejuela later notes parenthetically only that plaintiff "is already on Zoloft, Remeron and Depakote," AR 213. These inherent problems with Dr. Abejuela's report undermine his findings.

////

14

1   Dr. Abejuela made the following diagnosis:

2      Axis I:   Substance Induced Mood Disorder
            Polysubstance Dependence, by history
3      Axis II:   Deferred
        Axis III:   Seizure disorder.  Deferred to the appropriate specialist.
4      Axis IV:   Psychosocial stressors: Unspecified.  Dealing with the seizure
            disorder.
5      Axis V:   Refer below

6 AR 211.

7   The Axis V notation apparently refers to Dr. Abejuela's findings that plaintiff has no

8 more than mild impairments in functioning, AR 212-213.[14]  Dr. Abejuela found no restrictions

9 whatsoever in an attached "Medical Source Statement of Ability to Do Work-Related Activities

10 (Mental)."  AR 215-217.

11   3.  Internist Sylvia Gates Cable, M.D.

12   On November 18, 2004, Internist Sylvia Gates Cable, M.D., evaluated plaintiff at the

13 request of the Commissioner.   AR 218-228.

14

15   [14]  Dr. Abejuela made the following findings regarding plaintiff's mental functional
limitations:

16

17   1.  There is no mental restriction in the patient's daily activities.
   2.  There are mild mental difficulties in maintaining social functioning.
   3.  The patient's concentration, persistence, and pace are slightly impaired.
18   4.  There are no repeated episodes of emotional deterioration in work-like
   settings.
19   5.  The patient's ability to understand, carry out, and remember simple
   instructions is not impaired as long as he is not under the influence of drugs or
20   alcohol.
   6.  The patient's ability to understand, carry out, and remember complex
21   instructions is mildly impaired.
   7.  The patient's response to co-workers and supervisors, and the public is slightly
22   impaired.
   8.  The patient's ability to respond appropriately to usual work situations is
23   slightly impaired.
   9.  The patient's ability to deal with changes in a routine work setting is slightly
24   impaired but does not preclude function.
   Overall, the patient's psychiatric limitations range from none to mild as long as he
25   continues to abstain from drugs and alcohol.

26 AR 212-213.

Dr. Cable recounted plaintiff's complaint of grand mal seizures but noted that "[h]e does not describe consistent incontinence, tongue biting or loss of consciousness," but rather "running away or violent behavior." AR 219. Dr. Cable noted a long-standing mood disorder, and that plaintiff's current medications were Dilantin, Zoloft, Zyprexa, Depakote, Klonopin, Paxil and Risperdal. *Id.*

Plaintiff measured 67" tall and weighed 150 pounds. AR 220. Neurologically, he appeared "slightly agitated" but was conversant. AR 221. Plaintiff complained of "intermittent new-onset musculoskeletal complaints but has no physical limitations in his functional status." AR 220. Dr. Cable found that plaintiff has no functional restrictions, except in inherently hazardous work (machinery, heights, etc.) due to "seizures and violent behavior in a paranoid schizophrenic," AR 222, 228, and offered the following impression:

> 1. The patient has a long-standing history of mental health problems and is on multiple psychoactive drugs.
>
> 2. The patient also has a history of relatively-new onset seizures. He states he has had seven seizures since June.
>
> 3. In light of the patient's complex psychiatric history, a mental health assessment should be considered.

AR 222.

C. <u>STATE AGENCY REVIEWS</u>

On June 16, 1998, a State Agency physician completed a Psychiatric Review Technique Form ("PRTF"), AR 120-128, and found that plaintiff meets the criteria for Listed Impairment 12.09D (Substance Addiction Disorders), based on meeting the additional criteria set forth in Listing 12.08 (Personality Disorders).[15] The State Agency physician found that plaintiff has

---

[15] Listing 12.09 incorporates listed impairments for other mental disorders. As stated in Appendix 1, "Listing 12.09 is structured as a reference listing; that is, it will only serve to indicate which of the other listed mental or physical impairments must be used to evaluate the behavioral or physical changes resulting from regular use of addictive substances." 20 C.F.R. Pt. 220, App. 1, § 12.00A.

maladaptive personality traits (pathological dependence, passivity, or aggressivity, and intense and unstable interpersonal relationships and impulsive and damaging behavior) and, with respect to the "B" criteria for assessing the severity of a mental impairment, 20 C.F.R. §§ 404.1520a (b),(c),(d), 416.920a (b),(c),(d),[16] that plaintiff has "moderate to marked" restriction of activities of daily living; "marked" difficulties in maintaining social functioning; "frequent" difficulties in maintaining concentration, persistence, or pace; and "continual" extended episodes of decompensation.  AR 125, 127.

On February 20, 2003, a State Agency physician completed a Psychiatric Review Technique Form ("PRTF"), AR 130-143, and found that plaintiff meets the criteria for Listed Impairment 12.09B (Substance Addiction Disorders), based upon meeting the additional criteria set forth in listing 12.04 (Affective Disorders),[17] AR 130.  With respect to the "B" criteria for

---

Listed Impairment 12.09 is based upon findings of "[b]ehavioral changes or physical changes associated with the regular use of substances that affect the central nervous system," and one additional listed impairment.

The companion finding in this instance was Listed Impairment 12.08 (Personality Disorders), characterized by "personality traits [that] are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.  To meet the criteria of Listing 12.08, the requirements of both "A" (deeply ingrained, maladaptive patterns of behavior) and "B" (mental functional limitations) must be met.

[16]  These regulations requires that the administrative law judge rate the degree of functional limitation resulting from a medically determinable mental impairment(s) in accordance with the following four functional areas (the "'B' criteria"):  Activities of daily living; Social functioning; Concentration, persistence, or pace; and Episodes of decompensation. A five-point scale is used to rate the degree of limitation in the first three functional areas ("None, mild, moderate, marked, and extreme").  A four-point scale is used to rate the degree of limitation in the fourth functional area ("None, one or two, three, four or more).  If the degree of limitation in the first three functional areas is "none" or "mild," and is "none" in the fourth functional area, it is generally appropriate to conclude that a claimant's mental impairment is not severe.  20 C.F.R. §§ 404.1520a (b),(c),(d), 416.920a (b),(c),(d).

[17]  The companion finding in this instance was Listed Impairment 12.04 (Affective Disorders) which provides in its introductory paragraph that such disorder is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation."  To meet the required level of severity for this disorders, a claimant must

assessing the severity of a mental impairment, the State Agency physician found that plaintiff has 'marked" restriction of activities of daily living; "marked" difficulties in maintaining social functioning; "marked" difficulties in maintaining concentration, persistence, or pace; and "one or two" extended episodes of decompensation. AR 140. The State Agency physician noted treatment findings of mood disorder secondary to cocaine dependence, and stated that "Claimant presents with ongoing chronic polysubstance dependence with daily use of alcohol and crack cocaine. Substance abuse it the major [illegible] factor affecting function." AR 142.

On February 26, 2003, the Commissioner initially denied plaintiff's application based on a primary diagnosis of "Substance Addiction Disorder (Drug)," and secondary diagnosis of "Affective/Mood Disorder," noting "DAA [drug alcohol addiction] is material, P.L. 104-121, drug and alcohol addiction." AR 34, 232. The Commissioner explained:

> You said you are unable to work because of mental problems of schizophrenia and depression.
>
> Although you experience mental problems, including depression, your records show that you are able to communicate with others, act in your own interest and perform most ordinary activities.
>
> We have considered only the impairments which are not related to drug addiction or alcoholism in making this determination. These impairments are not disabling.
>
> We reviewed the facts in your case and decided that drugs and alcohol are a contributing factor material to a finding of disability. This means you would not be disabled if you stopped using drugs and alcohol. Therefore, we cannot consider you disabled under the law.

AR 35, 233; *see also* AR 234-238

Upon reconsideration, on July 24, 2003, the Commissioner again denied plaintiff's applications based on a primary diagnosis of "Substance Addiction Disorder (Drug)." AR 36-42, 239-243.

---

meet the requirements in both "A" (medically documented symptoms of depression, mania, or bipolar disorder) and "B" (mental functional limitations), or the requirements of "C" (repeated episodes of decompensation, vulnerability to episodes of decompensation, inability to function outside a highly supportive living arrangement).

V. <u>THIRD PARTY STATEMENTS</u>

Sherlean Kelly completed a Third Party Activities of Daily Living Questionnaire. AR 87-91. Ms. Kelly stated that she saw plaintiff "2 day week." AR 87. She answered "don't know" to most questions, but stated that plaintiff "walk much [at] night," and "act like he need to be told what to do," AR 87, 90, and concluded:

> I just know he need help from some body, because some is wrong with but I don't know what it is, he scare us sometime when he do come around so that why he don't come around to much.

AR 91

Betty Bonner, with whom plaintiff lived at some point, also completed a Third Party Activities of Daily Living Questionnaire. AR 98-103. Ms. Bonner stated in full:

> He just sit in his room and don't come out. He will come out sometimes and eat and go back to his room. He carry knives and scare us sometimes because we don't know whether he is going to hurt hisself or us. He talks crazy sometimes and go into wild tantrums talking off the wall stuff.
>
> When he starts on something it starts well, but it never gets finish and you have to constantly remind him what he was doing in the first place. He mind is never on the right track anymore. He seems to be more troubled as he gets older.
>
> A good day is when he is quiet and not saying to much to anyone and we like to keep him calm that way. A bad day is when he locks up in his room and you can hear him talking to his self outside his door. Because when he comes out you don't know what to expect.
>
> We know he need help and assistance and we do the best we can for him but he has no money, no insurance and no one else wants to care for him.

*Id.*

VI. <u>DISCUSSION</u>

In concluding, by application of the Medical-Vocational guidelines, that plaintiff is not disabled, the ALJ was required to find, as he did, that plaintiff has no significant nonexertional impairment. On this record, the finding is curious. It plainly is not supported by substantial evidence of record. "A non-exertional impairment, if sufficiently severe, may limit the claimant's functional capacity in ways not contemplated by the guidelines." *Desrosiers v. Sec'y*

*of HHS*, 846 F.2d 573, 577 (9th Cir. 1988). While the ALJ credited plaintiff's allegations of seizure disorder sufficiently to adopt the finding of the consulting internist that plaintiff should not engage in hazardous work, the ALJ discredited all other evidence of record, including numerous medical reports that plaintiff is beset by significant psychological impairments resulting in violent and unpredictable behavior. The ALJ also ignored plaintiff's testimony that the many psychotropic medications prescribed to "keep him down" render him lethargic and dysfunctional. Plaintiff's descriptions of his behavior and the side effects of the medication are entirely consistent with the observations documented by the medical professionals, and with the record as a whole. They must be adequately addressed. *See* Social Security Ruling 88-13; *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (adverse side effects to medication must be considered in evaluating a claimant's subjective complaints).

The consulting psychiatrist, Dr. Abejuela, upon whose opinion the ALJ relied, ignored plaintiff's troublesome subjective complaints, and failed to address the impact of plaintiff's numerous medications. His report appears to take no account of the hospital reports and the documented observations and findings by the other psychiatrists. Additionally, his opinion, lacks any objective findings other than the results of a cursory mental status exam. The internal inconsistencies within the report render it difficult, indeed, impossible to know which version of the facts to accept as his controlling opinion. Those self-contradictions and the report's irreconcilable conflict with the evidence reported by every other medical professional of record renders the report, as a whole, unreliable.[18] Little weight is to be accorded medical source opinions that lack objective findings, 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3), and "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.' *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)." *Tackett v. Apfel*,

_____

[18] Although Dr. Abejuela's report is arguably consistent with the 1998 findings of Mr. Richardson, who examined plaintiff while he was incarcerated and not under the effects of the subsequent psychosis and medications, plaintiff's situation was much different when he reported to Dr. Abejuela in 2004.

180 F.3d 1094, 1098 (9th Cir. 1999).  Even the consulting internist, Dr. Cable,

contemporaneously found plaintiff "agitated," and opined that he should avoid hazardous

activities due both to "seizures and violent behavior in a paranoid schizophrenic."  AR 228.  Dr.

Abejuela's opinion does not provide substantial evidence to support the ALJ's decision.

While partially crediting plaintiff's testimony of seizures, the ALJ discredited plaintiff's

statements concerning their alleged influence on his behavior, even though these statements were

corroborated by the statements of Ms. Kelly and Ms. Bonner, both of whom expressed concerns

about plaintiff's exhibited potential for violence.  AR 91, 98.  "[L]ay witness testimony as to a

claimant's symptoms or how an impairment affects ability to work is competent evidence."

*Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996); *see also* 20 C.F.R. §§ 404.1513(d)(4),

416.913(d)(4).  The ALJ rejected the statement of Ms. Kelly because she "mostly indicates

'don't know,'" and the statement of Ms. Bonner because it "provides little in the way of reliable

evidence indicating that the claimant suffers impairment-related limitations that would be

inconsistent with the demands of substantial gainful activity."  AR 27.  However, the reliability

of this evidence is demonstrated and underscored by a record replete with references to plaintiff

sleeping with hammers and knives, threatening others with a hammer, and cutting himself in a

suicide attempt, as well as plaintiff's testimony that he can't live with family members because

they are afraid of him.  This third party evidence has significant implications in considering

whether plaintiff can function in a work setting, and the ALJ erred in discrediting it.

The elephant in the room, ignored entirely by the administrative law judge by concluding

that plaintiff is not disabled, is whether plaintiff's unpredictable behavior and other

nonexertional limitations are attributable to current substance abuse.  By selectively crediting

plaintiff's testimony – and the finding of Dr. Abejuela – that plaintiff was not currently using

alcohol or street drugs, the ALJ avoided this difficult analysis.  Whether drug or alcohol

addiction is a contributing factor material to the finding of disability is an analysis conducted

only after a finding of "disabled" under the fifth step of the sequential analysis, *Bustamante v.*

*Massanari*, 262 F.3d 949, 954 (9th Cir.2001).[19]

Were these issues not so interrelated, a remand for payment of payments would be appropriate on this record. However, this outstanding issue must be resolved before a determination of disability and/or payment of benefits, can be made. It is incumbent upon the Commissioner to obtain all current medical records, and detailed, accurate and current examining opinions, as to whether plaintiff's limitations prevent him from performing substantial gainful activity and, if so, whether these limitations exist, or would continue to exist, in the absence of substance abuse. *See Mayes v. Massanari,* 276 F.3d 453, 459-60 (9th Cir. 2001) (ALJ's duty to further develop the record is triggered when there is ambiguous or inadequate evidence).

VII. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment, Dckt. No. 18, is granted;

2. The Commissioner's cross-motion for summary judgment, Dckt. No. 19, is denied;

3. This case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. 405(g), for further proceedings consistent with this order; and

////

////

_____

[19] Under 42 U.S.C. § 423(d)(2)(C), a claimant cannot receive disability benefits "if alcoholism or drug addiction would ... be a contributing factor material to the determination that the individual is disabled." The purpose of the statute is "to discourage alcohol and drug abuse, or at least not to encourage it with a permanent government subsidy." *Ball v. Massanari,* 254 F.3d 817, 824 (9th Cir. 2001). Under the implementing regulations, the ALJ must conduct a drug abuse and alcoholism analysis ("DAA Analysis") by determining which of the claimant's disabling limitations would remain if the claimant stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b). If the remaining limitations would still be disabling, then the claimant's drug addiction or alcoholism is not a contributing factor material to his disability. If the remaining limitations would not be disabling, then the claimant's substance abuse is material and benefits must be denied. *Id.* Plaintiff bears the burden of proving that drug or alcohol addiction is not a contributing factor material to the finding of disability. *Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007).

4. The Clerk is directed to enter judgment in favor of plaintiff.

Dated:  March 30, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE